Walter J. Richert, Appellant, v. James E. Bennett
et al., Appellees.

Gen. No. 8,998.

Opinion filed February 10, 1936.

W. H. DYER and JOHN H. BECKERS, both of Kanka-
kee, for appellant.

MOSES, KENNEDY, STEIN & BACHRACH, of Chicago, and
EVA L. MINOR, of Kankakee, for appellees; WALTER
BACHRACH and ARTHUR MAGID, of Chicago, of counsel.

MR. JUSTICE DOVE delivered the opinion of the court.
The defendants in this case are James E. Bennett,
Frank A. Miller, Frank F. Thompson, Thomas Bennett

and Emmet G. Barker, a partnership doing a brokerage business in Chicago, Illinois, with a branch office in Kankakee, of which Melvin H. Cooley was manager.

The evidence discloses that Cooley had a personal trading account in the defendants' office at Chicago, which he carried in the name of his wife, Mary E. Cooley, and this account bore the number 52. Mr. Cooley not only put his own stock deals or transactions and those of his wife, through this account, but also through this account from time to time he put through the stock deals and transactions for several of his friends, and among the latter were those of Walter J. Richert, the plaintiff herein.

The evidence further discloses that the Mary E. Cooley account, bearing the number 52, was a voluminous one and during all the period covered by the transactions in this case it contained a large and substantial equity. The method of doing business which Cooley employed was that when one of Mr. Cooley's friends desired to buy stock on margins but did not desire to put up cash or collateral to cover the margins, Mr. Cooley would take the order and put it through this account without requiring his friend to deposit cash or collateral with the order to cover margins. The margin ordinarily required by defendant was 30 per cent of the market price of the stock on the day it was purchased. Thus, if one should purchase on margin 100 shares of a certain stock which was selling on that date at $30 per share, he would have to put up 30 per cent or $9 per share as margins to protect the account. If the market price of the stock went down additional margins would be required so that at all times, after deducting the loss resulting from the drop in the market, the margins on deposit would represent 30 per cent of the market price. If margins were not kept good and the stock dropped to $21 per share, it would be sold and the transaction closed, the customer

losing $9 per share, and the commission on the purchase and sales. If, on the other hand, the market advanced to say $40 per share, the customer could order it sold, withdraw his margin of $9 per share and receive in addition a profit of $10 per share, less commissions. When Mr. Cooley took an order from one of his friends, if there was enough equity in the account to apply on margins, he could put the order through it and thus favor his friend by requiring no margin until such time, if ever, as the stock went down enough to make it unsafe for him to carry it. As long as the market price remained constant or was advancing, he was taking no chance of losing. If the price declined, he could call on his friend to put up the necessary margins to protect his stock. In a deal of this kind, the stock ordered was purchased by Melvin H. Cooley in the name of Mary E. Cooley and charged to her account number 52. If the price went down, Mr. Cooley would call for margins and the person for whom the stock was ordered could put up cash or collateral to protect his account with Mr. Cooley.

In the instant case, it is the contention of the plaintiff that on the 25th of September, 1929, he went to the office of defendant in Kankakee, managed by Melvin H. Cooley, and ordered of the defendant through the manager 100 shares of the capital stock of ''American Agricultural Chemical Preferred'' and margined it with an assigned certificate for 100 shares of Mid-Continent Petroleum Corporation stock; he testified that he heard Mr. Cooley give the order to the telegraph operator in these words ''Buy one hundred American Agricultural Preferred, and charge it to account fifty-two,'' and saw that he, Cooley, wrote on a piece of paper something which he supposed was an order. He insists that he did not know at the time what account 52 meant, and did not learn its meaning until it was explained during the trial, and thought he

was dealing with the defendant through its office manager and not with Mr. Cooley as an individual or independent broker.

The plaintiff further testified that on October 30, 1929, Mr. Cooley told him the house was calling for more margin on his stock and that he gave to Cooley an assigned certificate for 100 shares of Pure Oil stock.

The theory on which plaintiff bases his right to recover is that on September 25, 1929, he gave to defendants, through their manager at Kankakee, an order to buy 100 shares of the preferred capital stock of American Agricultural Chemical Company, and at the same time deposited with them for margins on that order 100 shares of the capital stock of the Mid-Continent Petroleum Corporation, and on October 30, 1929, delivered to them 100 shares of the capital stock of the Pure Oil Company; that defendants did not execute his order for the 100 shares of American Agricultural Chemical Preferred, but did convert to their own use the 100 shares of Mid-Continent Petroleum and the 100 shares of the capital stock of the Pure Oil Company; that the 100 shares of Mid-Continent Petroleum was worth 32⅛ on September 25, 1929, the date it was put up, or a total of $3,212.50; that he is entitled to recover from defendants that sum, together with interest thereon at five per cent for five years and two months, amounting to $829.90; that he is also entitled to recover the value of the 100 shares of the Pure Oil Company stock, worth on October 30, 1929, 24¾, or a total of $2,475, together with interest upon that amount for five years and one month at five per cent, or $629.06, making a total of $7,146.46, and this is the amount for which he seeks a judgment.

In the circuit court a jury was waived and upon a trial of the issues made by the pleadings, the court found that the plaintiff was dealing with Mr. and Mrs. Cooley individually and through account 52 and that

the defendants were not liable and rendered judgment in favor of the defendants and against the plaintiff in bar of the action and for costs, and from that judgment the record is brought to this court for review.

Appellees, the defendants below, concede that Mr. Cooley was their manager and agent at the Kankakee office and that he carried on transactions and put through deals in the account of Mary E. Cooley which they carried as account 52. It was their contention in the trial court, however, that they never received any order from appellant to buy for him 100 shares of the preferred stock of the American Agricultural Chemical Company, and never took or received from him as collateral on margins 100 shares of Mid-Continent Petroleum or 100 shares of the capital stock of the Pure Oil Company.

We think a preponderance of competent evidence in this record establishes the following facts:

1. That appellant gave his order to Mr. Cooley to purchase for him the 100 shares of American Agricultural Chemical Preferred on the 25th day of July, 1929, and not on the 25th day of October as appellant claims, and that it was bought for him July 25, 1929, through account 52; that the Mid-Continent and Pure Oil certificates of stock were put up with Mr. Cooley by appellant on September 25, 1929, and October 30, 1929, respectively, to cover margins upon notice in each case from Mr. Cooley that margins were required in order to protect the deal; that about a year thereafter, appellant accepted from Mr. Cooley, his wife and son, a written statement that his account was long the three blocks of stock mentioned; that by this statement, signed by the Cooleys, they agreed to carry the account for appellant for one year at six per cent interest.

2. That appellant, from his dealings and conversations with Mr. and Mrs. Cooley and others connected

with them, knew that he was dealing with Melvin H. Cooley, not as agent of appellees nor as manager of their Kankakee office, but as an individual or independent broker, and that his deal was being carried in account 52.

3. That an account was rendered about September 17, 1931, to appellant by Mrs. Cooley, showing he owed to the Cooleys the sum of $5,132, which appellant said he was unable to pay and requested Mrs. Cooley to carry him another year, as they had done for the previous year; that Mrs. Cooley refused and appellant declined to put up other collateral.

4. That thereupon Mrs. Cooley informed appellant that she would sell him out that day and at once walked into the branch office of appellees at Kankakee and ordered appellant's 300 shares of stock sold and thereafter rendered appellant a statement showing credits for sale on the 17th day of September, 1931, of 100 shares of American Agricultural Chemical Preferred @ 10, or a total of $983.50, of 100 shares of Mid-Continent Petroleum @ 7, or a total of $688.50, and of 100 shares of Pure Oil Company stock @ 6½ or a total of $641.50. Other charges and credits on the statement disclosed a balance due the Cooleys of $3,074.50.

5. That appellant discussed with Mrs. Cooley his indebtedness, expressed a doubt about owing the amount claimed but said in substance that if the amount was right, he would pay it if he ever got the money.

6. That at all times from the 25th day of July, 1929, up to September 17, 1931, the Cooleys had in account 52 or in their safety box in Kankakee 100 shares or more of the capital stock of American Agricultural Chemical Company, 100 shares or more of the capital stock of Mid-Continent Petroleum Corporation and 100 shares or more of the capital stock of the Pure Oil Company, and were in a position to deliver same to appellant at any time he paid or secured to them the amount he owed them.

It is insisted by appellant that the evidence shows that the certificates originally representing the stock which was delivered by appellant to the Cooleys as collateral and which were handled through account 52 for appellant were, during the period, canceled and other certificates issued in lieu thereof to other persons than appellant, and that this amounts to a conversion. The evidence does so show, but appellant's conclusion is erroneous. He misconceives the nature of corporate stock and the function of certificates representing such stock. Corporate stock is fungible, that is, one share of stock is the same as any other share of the same class in the same corporation and falls within the term of fungible goods as defined in sec. 76 of the Uniform Sales Act, Ill. State Bar Stats. 1935, ch. 121a, ¶ 79. It does not follow that a change of certificate is a change in the property represented by the certificate. Certificates may be canceled and new ones issued without changing the property right in the stock which the certificates represent. If appellant had put up an assigned certificate for 100 shares of his stock for margin, and if the deal had been closed with a profit to him and he became entitled to take down his stock so held for margins, he could not demand that the identical certificate be returned to him, but would be required to accept any certificate for the same number of shares of the same stock in the same class in the same corporation. *Richardson v. Shaw,* 209 U. S. 365.

We do not believe any useful purpose would be served by discussing in this opinion the contention that improper evidence was admitted by the trial court upon the hearing. The case was tried by the court and in our judgment the competent evidence in the record sustains the findings hereinabove set forth and from the competent evidence in the record, we agree with the trial court that appellant's dealings, while with a person conceded to be appellees' agent, were by him knowingly carried on with that person, not as an agent

486

of appellees, but as an individual or independent broker.

In this state of the record, the trial court properly held that appellees were not guilty of having failed to purchase for appellant on his order 100 shares of American Agricultural Chemical Preferred stock, as alleged in his complaint, because he gave them no such order, and the trial court also properly found from the evidence in this record that appellees were not guilty of wrongfully, fraudulently, and unlawfully selling 100 shares of Mid-Continent Petroleum, and 100 shares of Pure Oil stock delivered to them to secure them for margins on the American Agricultural Chemical stock and were not guilty of converting the proceeds thereof to their own use, as charged by appellant, because no such delivery was ever made to them for such purpose.

The judgment of the trial court is affirmed.

*Judgment affirmed.*